## IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| JESSE LEE TURNER, | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO.    25-cv-04873 |
| DANIEL GOODWIN, PAULA | § | |
| PARAMORE, and AAG CAPITAL, INC., | § | |
| | § | |
| **Defendants.** | § | |

### PLAINTIFF'S SECOND AMENDED COMPLAINT

Jesse Lee Turner, plaintiff, respectfully complains of defendants Daniel Goodwin, Paula Paramore, and AAG Capital, Inc. and in support states the following:

### Parties

1.      Jesse Lee Turner is an individual residing in Angelina County, Texas.

2.      Daniel Goodwin is an individual residing in Montgomery County, Texas. Daniel Goodwin has been served with process and has filed an answer herein.

3.      Paula Paramore is an individual residing in Angelina County, Texas. Paula Paramore has been served with process and has filed an answer herein.

4.      AAG Capital, Inc. is a Florida Corporation, and a non-resident of the State of Texas. AAG Capital has been served with process and has filed an answer herein.

### Jurisdiction

5.      This is a court has jurisdiction over this case pursuant to 28 U.S. Code §1331 because the matter in controversy involves a federal question.

**Venue**

6.     Venue is proper under 28 U.S.C. 1391(b) because one or more of the defendants resides in the Southern District of Texas and a substantial part of the events or omissions giving rise to the claim occurred in the Southern District.

**Summary**

7.     In 2022, Plaintiff, an 86-year-old man, sold his business comprised of three mobile home parks for approximately $2,000,000. Plaintiff sold the mobile home parks because he was in poor health at the time, was advanced in age, and was concerned he could no longer properly manage the parks. The sale proceeds represented Plaintiff's life savings. Plaintiff intended to use the sale proceeds to pay all capital gains taxes and to fund the remainder of his life, including any necessary long-term care.

8.     Taking advantage of Plaintiff's advanced age and poor health, in an apparent effort to earn large commissions, Defendants convinced Plaintiff to buy high risk assets purportedly to save on capital gains taxes. To convince Plaintiff to make these investments, Defendants told Plaintiff a series of lies. Defendants told Plaintiff (i) he would have to pay $465,000 in capital gains taxes, (ii) his daughters would have to pay an additional $465,000 in taxes after his death, (iii) the recommended investments were the only investments that would avoid the capital gains taxes, (iv) there were no risks associated with the investments, (v) Plaintiff only had 30 days from the sale of his mobile home parks to invest the sale proceeds, and (vi) there were no other costs beyond the purchase price.

9.     Unbeknownst to Plaintiff, all of these statements were untrue. Most significantly, the capital gains tax would have been approximately half the stated amount; Plaintiff's daughters

2

would not pay any taxes associated with the sale of the mobile home parks; Plaintiff had six months to decide whether to purchase the investments; and the recommended investments were extremely risky. Had Defendants told the truth about any of these matters, Plaintiff would not have purchased the recommended investments.

### Factual Background

10.    Jesse Lee Turner ("Jesse") is an 86-year-old man who lives in Lufkin, Texas. Jesse started a mobile home business in 2003 with the purchase of a single mobile home. Over the next decade, Jesse expanded his business to three mobile home parks in three different towns in Texas: San Augustine, Nacogdoches, and Lufkin (hereafter the "Mobile Home Parks").

11.    In 2020, Jesse was diagnosed with diverticulitis at MD Anderson Hospital in Houston, Texas. Diverticulitis involves an irritation of the colon that often causes holes in the colon. The doctors at MD Anderson recommended surgery to treat the diverticulitis.

12.    Due to Covid concerns, overcrowded hospitals, and limited restricted hospital visitors in 2020, Jesse's surgery was delayed. With an uncertain medical outcome, Jesse made the decision to sell the Mobile Home Parks before having surgery. To that end, after learning about his condition in 2020, Jesse began making preparations to sell the Mobile Home Parks. His goal was to sell the parks and put the proceeds in conservative investments that would fund the remainder of his life.

13.    For approximately two years, Jesse worked on preparations to sell the Mobile Home Parks. During that time, he suffered from the serious effects of his diverticulitis including regular sickness and serious infections. Jesse was under the care of two treating physicians during that

time-period who helped him deal with the infection and sickness. His care involved antibiotic treatment for infection and medications for the pain.

14. By mid-2022, Jesse's colon developed a hole and, compounding the problem, his colon fused to his bladder allowing poisons from his colon to escape into his bladder and causing a life-threatening situation. The fusing of a colon to the bladder is known as a colon fistula. Over the two-year period, Jesse lost approximately 100 pounds due to this condition. Despite his rapidly worsening health condition and desperate need for surgery, Jesse continued working on sale preparations through the first half of 2022, however, by June 2022, Jesse was so sick he could barely function.

15. Having spent two years of his life preparing the Mobile Home Parks for sale and dealing with his ever-worsening diverticulitis, Jesse finally found a buyer in 2022. Jesse closed on the sale on June 29, 2022. The net proceeds from the sale were $2,035,000, which were more than enough money to comfortably care for Jesse for the rest of his life, even after payment of capital gains taxes on the sale. The sale came as a tremendous relief to Jesse because, by closing, his health condition had deteriorated to a point where he could barely function.

16. In connection with the sale, Jesse agreed to remain with the Mobile Home Parks during the month of July to assist with the transition to the new buyer. For that reason, Jesse further delayed surgery during July 2022, despite his serious health issues.

17. A month or more before the sale of the Mobile Home Parks closed, Paula Paramore the owner of Absolute Services, the bookkeeping company that had provided bookkeeping services for the Mobile Home Parks for many years, introduced Jesse to Dan Goodwin ("Goodwin").

Goodwin is an investment advisor who was acting as a representative of and selling securities through broker dealer AAG Capital, Inc. ("AAG").

18.     Respondents met with Jesse on at least three occasions during June and July 2022 at Paramore's conference room in Lufkin, Texas. The purpose of these meetings was to convince Jesse to invest the proceeds from the sale of the Mobile Home Parks into Delaware Statutory Trusts. Throughout the time-period of these meetings, Jesse was 84 years old, was suffering with the painful effects of diverticulitis, was poisoned from toxins entering his bladder, was heavily medicated due to the infection and pain, and was in dire need of surgery.

19.     Rather than helping Jesse achieve his goals, Respondents concocted a scheme to line their pockets and AAG's pockets with maximum commissions while placing Jesse in a high-risk and highly unsuitable series of investments. Goodwin, Paramore, and AAG's scheme preyed upon Jesse's advanced age, ignorance of tax laws, and weakened medical condition to persuade him to go along with this scheme.

20.     Goodwin, Paramore, and AAG's scheme was to convince Jesse that he needed to do a 1031 exchange[1], which would require the purchase of a like and kind asset to a mobile home park. The necessity of a like and kind exchange would open the door to purchases of Delaware Statutory Trusts ("DSTs") which held ultra high-risk investments such as portfolios of mobile home parks (the business he just divested himself from), an apartment complex in Ocala Florida (the economics of which were totally unknown), and a private dormitory at the University of Alabama (the economics of which were totally unknown).

---

[1] A 1031 exchange, also known as a like-kind exchange, allows real estate investors to defer capital gains taxes by swapping one investment property for another of similar use. The exchanged properties must be "like-kind" to each other, meaning they serve the same purpose (e.g., both are rental properties). This deferral of tax is governed by Section 1031 of the Internal Revenue Code.

21.     On August 18, 2022, Jesse collapsed due to his diverticulitis outside a restaurant in Lufkin, Texas and woke up at the emergency room in Lufkin. He remained at the hospital for one week. In September after leaving the hospital, Jesse met with the surgeon to move forward with surgery to deal with his diverticulitis. The surgeon said he wanted to operate as soon as possible, but he needed to have a heart examination first. Jesse subsequently had a heart examination which revealed that he needed heart surgery. On January 4, 2023, Jesse had a heart catheterization. On January 20, 2023, Jesse had a second heart surgery to insert two stints.

22.     Jesse was finally able to have surgery for diverticulitis in March 2023. Jesse remained in the hospital for eight days, after which he returned home and was cared for by his daughters and home health. On April 6, 2023, Jesse went to a rehabilitation facility. On May 25, 2023, Jesse had a second surgery for his diverticulitis. After remaining in the hospital for five days, he returned home and was again cared for by his daughters and home health.

23.     Jesse eventually recovered from his diverticulitis surgeries, however, he developed two stomach hernias which required surgery. In November 2023, Jesse had surgery to repair the two hernias. Jesse had a second hernia surgery to repair two additional hernias in January 2024.

24.     Jesse had the most recent surgery related to his diverticulitis in March 2024. Jesse finally recovered from two years of surgeries over the summer of 2024.

25.     For the reasons stated above, at the time of his meetings with Respondents, Jesse was highly susceptible to undue influence and coercion. Jesse was not knowledgeable of capital gains rates, estate tax laws, and had never heard of 1031 exchanges or DSTs. Respondents used Jesse's susceptibility and naivete to convince him to go along with their scheme.

26.     Respondents' first line of attack was to convince Jesse of the need for a 1031

exchange. To accomplish that goal, they had to convince him that the capital gains taxes associated with the sale of the Mobile Home Parks were so large that they must be avoided at all costs.

### *First Lie - Tax Liability Would Be $465,000*

27.     Respondents first told Jesse that if he did not use a 1031 exchange he would incur $465,000 in capital gains taxes in connection with the sale. According to Jesse's current accountant, this tax figure grossly overstated Jesse's potential tax liability. More specifically, Jesse's estimated tax liability associated with the sale of the three mobile home parks for cash without any 1031 deferral of the gain would have been $238,027. Conveniently, Respondents neglected to consider closing costs (expenses of sale) and cost basis of the property sold. As 1031 exchange specialists and proponents of 1031 exchanges, Respondents should be familiar with these straight forward tax concepts and should have informed Jesse that his potential tax liability in the absence of a 1031 exchange could have been significantly less than $465,000. Respondents never even recommended Jesse seek independent tax advice before committing to a 1031 exchange. Had Respondents explained that Jesse's tax liability without a 1031 exchange could have been significantly less than $465,000, Jesse never would have agreed to participate in a 1031 exchange.

### *Second Lie - Daughters Will Incur Additional $465,000 in Taxes Upon Jesse's Death*

28.     Even if the tax liability would have been $465,000, Jesse did not believe that sum justified going through a 1031 exchange. Jesse expressed that concern to Respondents. He also expressed a concern about the taxes his two daughters would have to pay if the money passed to them when he died. This issue was particularly concerning to Jesse with his health condition and looming surgery. Respondents told Jesse on more than one occasion that when he died his daughters would incur another $465,000 in taxes. When Jesse said that the $930,000 total would

eat up nearly half the sale proceeds, Respondents said that was correct. The statement that Jesse's children would incur an additional $465,000 in taxes as part of their inheritance is a blatant falsehood. Regardless, Jesse put his trust in Respondents and believed that his daughters would be required to pay an additional $465,000 when he passed away.

29.    The combination of the first two lies convinced Jesse of the need for a 1031 exchange. The lies below convinced him to go through with the 1031 exchange.

### *Third Lie - DSTs Are Only Option for 1031 Exchanges*

30.    With his advancing age and serious health concerns, Jesse's primary goals were to sell his Mobile Home Parks business, convert the proceeds into a zero-risk investment, and simplify his estate for his daughters. Respondents ignored these goals and convinced Jesse to purchase three separate Delaware Statutory Trusts. Prior to meeting Respondents, Jesse had never heard of a Delaware Statutory Trust or a DST. Respondents told Jesse that a 1031 exchange required the purchase of DSTs. Respondents identified no alternative investments options for Jesse through the 1031 structure besides DSTs. Jesse was not told what a DST was or how a DST operated. Respondents never explained to Jesse that he would be buying beneficial interests in different trusts and those trusts would invest in various commercial properties. He was simply told that he needed to buy DSTs.

### *Fourth Lie - DSTs are Risk Free*

31.    Jesse was told that the DSTs would pay him a predetermined, fixed monthly sum for a period of five years immediately after which he would receive repayment of his principal, plus a profit.

32.    Jesse was very concerned about the consistency of monthly payments from the

DSTs and the safety of the principal investment into the DSTs. Consequently, Jesse asked Defendants whether the predetermined, fixed monthly sums could be reduced or cease altogether and whether there was any chance of losing his principal.

33.     Jesse was assured that nothing could go wrong with either the predetermined monthly payments or the principal because the investments were government-controlled trusts and risk free and that no DST had ever failed. Jesse was given the impression that he would be investing in the equivalent of government bonds or treasury bills.

### *Fifth Lie – Jesse Only Had 30 Days to Purchase DSTs*

34.     Jesse told Respondents that he wanted to take some time to consider whether or not to go forward with the 1031 exchange structure. This comment prompted the fourth lie. Respondents told Jesse that he only had thirty days from closing on the sale of the Mobile Home Parks to close on his purchase of the DST interests otherwise it would be too late to do the 1031 exchange and he would incur the tax liabilities described above.

35.     These statements were wholly untrue. An exchangor has 45 days from the date the sale of relinquished property closes to nominate (identify) potential replacement properties. The exchangor has 180 days to acquire the replacement property should he choose to go forward with the 1031 exchange. Had Jesse been advised that he had 180 days--not 30 days--to close the sale, he would have investigated the 1031 proposal more closely and never would have proceeded.

### *Sixth Lie – There Were No Expenses or Fees Beyond the Initial Purchase Price*

36.     Throughout his discussions with Respondents, Jesse made it clear that he did not want to do the 1031 exchange if, in addition to his other concerns, the monthly income was taxable, and if there were any expenses beyond the initial purchase cost. Jesse was told that the payments

would be tax-free and he would not have to invest any money or pay any expenses or fees beyond the initial purchase funds.

### *Lies Led to $1,500,000.00 Investment*

37. Respondents pressured Jesse to invest $2,000,000 but ultimately convinced him to invest $1,500,000.00. More specifically, Respondents convinced Jesse to purchase three separate DSTs in the amounts of $800,000, $350,000 and $350,000, for a total of $1,500,000. Respondents told Jesse that the $800,000 DST named MHC would pay him monthly payments of $4,000 (which represents an annual return of 6.0%), and the other two DSTs named Vintage and the Walk would pay him fixed monthly payments of $1,230.83 each (which represents an annual return of 4.22%), for a total of $6,461.66 per month (which represents a combined annual return of 5.17%).

38. Respondents never explained to Jesse what assets were held in the DSTs. More specifically, Respondents never explained that one DST owned and operated an apartment complex in Florida, another owned a private dormitory at the University of Georgia, and the third held various mobile home parks (the very type of asset Jesse had just sold). On the very same day that Jesse authorized Investment Property Exchange Services, Inc. to purchase the DSTs, three emails were sent to him containing more than 900 pages of information regarding the DSTs. Jesse never saw those emails until months after signing the authorizations and did not become aware of the content of the attachments until years afterwards. No one ever told him that he had been sent by email three lengthy private placement memoranda or advised him that he needed to read the private placement memoranda before committing to the 1031 investments in the DSTs. Certainly, he was not given a reasonable opportunity to review 900 pages of memoranda when it was sent by email with no advance warning on the same day the purchase authorizations were signed,

particularly when Jesse was in such poor physical and mental health at the time.

39.     Had the nature of the assets or the risks of the investments as described in the private placement memoranda been explained to Jesse, he never would have gone forward with the 1031 exchange.

40.     Without any knowledge of the nature or risks of the investment and at Respondents' insistence, Jesse directed the title company to forward $1,500,000 from the proceeds from the sale of the Mobile Home Parks to Investment Property Exchange Services, Inc. to facilitate the 1031 exchange, and on July 7, 2022, Jesse directed Investment Property Exchange Services, Inc. to purchase three separate DSTs in the amounts of $800,000, $350,000 and $350,000, for a total of $1,500,000.

### *Lies Revealed*

41.     Within one month of funding the DST, Jesse was notified by one of the DSTs that he needed to pay a $2,000 fee in order to receive the monthly payments. Jesse had been specifically told that no further expenses would need to be paid.

42.     Upon recovering from his series of surgeries at the end of the summer, 2024, Jesse for the first time had an opportunity to evaluate the investments that the Respondents put him into. His evaluation revealed that the DST investments were wholly inconsistent with his instructions to Respondents including but not limited to the investments that were highly risky; the monthly payments were neither fixed nor certain; the monthly payments were taxable; tax benefits from the 1031 exchange were not as represented by Respondents e.g. his daughters would not have been subject to taxes equal to the capital gains taxes he would have incurred outside the 1031 context; Jesse did not receive quarterly statements regarding the DSTs; and there was no available pathway

to liquidating the DSTs and recovering his capital investment.

43.    As stated above, Defendants represented to Jesse that he would receive monthly payments of $4,000 from the MHC DST, $1,230.83 from the Vintage DST, and $1,242.50 from the Walk DST for a total of $6,473.33 per month. Notwithstanding these representations, beginning in 2024 payments for the Walk DST and the Vintage DST became erratic and regularly dropped below the represented amounts. Payments from both Walk DST and Vintage DST have stopped entirely.  Beginning in March 2025, payments from the MHC DST stopped entirely. Payments from MHC DST later resumed however they have since stopped again.

44.    Presently Jesse is not receiving any monthly revenues from any of the three DSTs instead of the represented sum of $6,473.33. This pattern of reduced payments over time not only establishes the fraudulent nature of Defendants' representations and the unsuitable nature of the investments but also indicates that the three investments are ponzi schemes. Furthermore, as shown below, Defendants knew of the risks associated with these investments and others of the same ilk.

### ***Defendants' Knowledge of Undisclosed DST Risks Is Undisputed***

45.    Attached as Exhibit "A" to this petition is a copy of an article <u>written by Defendant Daniel Goodwin</u> entitled "Six Risks of Delaware Statutory Trusts in 1031 Exchanges." In this article, Defendant Goodwin admits to the unsuitable nature of the DSTs by explaining the risks as follows:

> **Risk No. 1: No guarantees in the real estate game –**
> "Just as a star quarterback can't guarantee a Super Bowl win, DSTs can't promise foolproof returns. The real estate market is as unpredictable as a game of chance, subject to economic fluctuations, fickle[d] tenants and unforeseen challenges.
>
> Example: In 2008, many DST investors learned this lesson the hard way when the real estate market crashed. Properties that seemed like sure bets suddenly lost significant value, leaving investors with diminished returns and, in some cases, substantial losses."

**Risk No. 2: Backseat driving in your investment –**
"Investing in a DST is like being a passenger in a car — you're along for the ride, but you're not behind the wheel. As an investor, you don't hold the title to the property; instead, you own "beneficial interests" in the trust. The sponsor controls the property's management and sale, which can be frustrating for hands-on investors accustomed to calling the shots.

Example: Let's say you're part of a DST that owns a shopping center. You notice the anchor tenant's business is struggling and believe it's time to find a replacement. However, as a DST investor, you can't make that decision — you're at the mercy of the sponsor's judgment, for better or worse."

**Risk No. 3: Trapped in an investment time capsule –**
"Investing in a DST is like putting your money in a time capsule — it's not easy to retrieve before the designated time. DST interests are notoriously illiquid, with no active secondary market for selling your stake. This lack of flexibility can be problematic if you suddenly need access to your capital.

Example: Imagine investing $500,000 in a DST with a projected seven- to 10-year holding period. Two years in, you face an unexpected medical emergency requiring significant funds. Unfortunately, your DST investment is essentially locked up, leaving you in a financial bind.

On the other hand, a savvy financial team will not allow you to lock up your last available investment dollar in an illiquid investment. As with any investment, step one is to make certain you have a sufficient emergency fund in a liquid account so that life's emergencies (and they will happen) do not present you with insurmountable obstacles."

**Risk No. 4: Death by a thousand paper cuts (or fees) –**
"While DSTs can offer attractive returns, they often come with a smorgasbord of fees that can eat into your profits. These may include acquisition fees, asset management fees, disposition fees and more. It's crucial to weigh these costs against your potential tax savings.

Example: Let's say you invest in a DST that projects an 8% annual return. However, after accounting for various fees totaling 2% annually, your actual return drops to 6%. Over a 10-year investment period, this 2% difference could amount to tens of thousands of dollars in lost profits."

**Risk No. 5: The taxman cometh (maybe) –**
"DSTs are structured based on IRS Revenue Ruling 2004-86, which allows DSTs to qualify for 1031exchanges. However, the IRS could theoretically change its stance or rule unfavorably on a specific DST offering, potentially resulting in unexpected tax liabilities.

Example: Imagine you invest in a DST, deferring $200,000 in capital gains taxes. Five years later, the IRS issues a new ruling that disqualifies your specific DST structure from 1031 exchange eligibility. Suddenly, you're on the hook for that $200,000 tax bill, plus interest and penalties."

**Risk No. 6: The 'seven deadly sins' of DSTs** –
"To maintain their tax-advantaged status, DSTs must adhere to seven strict rules, often called the "seven deadly sins." These restrictions limit the trust's ability to adapt to changing market conditions, potentially impacting performance.

Example: Your DST owns an office building with a major tenant whose lease is expiring. Due to the "seven deadly sins," the DST can't renegotiate the lease terms or secure a new tenant without risking its tax status. This inflexibility could lead to a significant vacancy and lost income."

Had Jesse been told of these risks, he never would have consented to the purchase of the three DSTs.

## *Causes of Action*

46.     <u>Unsuitability</u>. Paragraphs 7 - 45 are incorporated herein by reference. Defendants, comprised of a registered broker, a licensed financial advisor, and those acting in concert with them, owed Jesse a duty to recommend only those investments and strategies that were suitable based on Jesse's financial situation, investment objectives, risk tolerance, and needs, pursuant to FINRA Rule 2111 (the "Suitability Rule") and other applicable laws and regulations. Jesse entrusted Defendants with providing investment advice decisions with the expectation that they would act in accordance with industry standards and regulatory obligations. Despite these duties, Defendants recommended and/or implemented an investment strategy and/or specific securities that were unsuitable for Plaintiff, given Plaintiff's financial condition, investment goals, risk profile and age. The investments recommended and/or implemented were:

a.     Excessively risky given Plaintiff's conservative or moderate risk tolerance;

b.      Concentrated in a particular sector or asset class, exposing Plaintiff to undue risk;

c.      Inconsistent with Plaintiff's stated investment objectives, including capital preservation, income generation, and low volatility;

d.      Not properly disclosed or explained to Jesse, depriving Jesse of the ability to make informed investment decisions.

47.      Defendant either knew or should have known that the investment(s) and/or strategy was unsuitable for Jesse. As a direct and proximate result of Defendant's unsuitable recommendations and failure to adhere to industry standards and legal obligations, Jeese suffered significant financial losses, including but not limited to diminution in account value, lost opportunity, and emotional distress. Jesse is entitled to recover damages, including compensatory damages, interest, costs, and any other relief deemed just and proper by the court.

48.      <u>Breach of Fiduciary Duty</u>.    Paragraphs 7 - 45 are incorporated herein by reference. Jesse is an individual who engaged Defendants, comprised of a registered broker, a licensed financial advisor, and those acting in concert with them, to provide investment advice and manage certain financial accounts and assets. At all relevant times, a fiduciary relationship existed between Jesse and Defendants by virtue of this engagement and the nature of the services provided, which required Defendants to act with utmost good faith, loyalty, care, and in the best interests of Plaintiff.

49.      Defendants owed fiduciary duties including, but not limited to:

a.    The duty of loyalty and to avoid conflicts of interest;

b.    The duty of full and fair disclosure of all material facts;

c.    The duty to act in good faith and with due care, skill, and diligence;

d.    The duty to place Plaintiff's interests above their own; and

15

e. The duty to make recommendations that were suitable and appropriate based on Plaintiff's financial circumstances and objectives.

50. Defendants breached their fiduciary duties by engaging in conduct that included, but was not limited to:

a. Making investment recommendations that were not suitable or in Plaintiff's best interest;

b. Failing to disclose material conflicts of interest;

c. Misrepresenting or omitting material facts concerning investment risks and strategies;

d. Engaging in self-dealing or otherwise prioritizing their own financial gain over Plaintiff's interests; and

e. Negligently managing Plaintiff's investment portfolio, resulting in unnecessary losses.

As a direct and proximate result of Defendants' breaches of fiduciary duty, Jesse suffered significant financial losses, including loss of investment value, missed opportunities for gain, and emotional distress related to financial insecurity. Jesse would not have sustained such damages but for Defendants' wrongful conduct.

51. Violation of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. Paragraphs 7 - 45 are incorporated herein by reference. This cause of action arises under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). Plaintiff is an individual investor who engaged Defendants, comprised of a registered broker, a licensed financial advisor and registered representative, and those acting in concert with them, to provide investment advice and execute securities transactions on Plaintiff's behalf. Defendants held themselves out as having superior knowledge of investment strategies and the securities markets and undertook to act on behalf of and for the benefit of Plaintiff.

16

52.    In connection with the purchase and sale of securities, Defendant, directly or indirectly, by use of the means and instrumentalities of interstate commerce, engaged in a scheme to defraud Plaintiff by knowingly or recklessly:

a.    Making material misrepresentations regarding the nature, safety, and suitability of certain investments;

b.    Omitting to state material facts necessary to make the statements made not misleading, including the risks and liquidity associated with the investments recommended;

c.    Failing to disclose conflicts of interest, including undisclosed compensation or incentives tied to the sale of certain securities;

d.    Engaging in unauthorized trading or churning in Plaintiff's account for the purpose of generating commissions; and

e.    Providing false or misleading account updates or performance summaries.

Defendants acted with scienter in that they knew or were reckless in not knowing that their statements were false and misleading, and that their omissions rendered other statements materially misleading. Defendant's conduct was willful and intended to deceive or defraud Jesse. Jesse reasonably relied on Defendants' representations and omissions in deciding to purchase, hold, or sell certain securities. Jesse relied on Defendants' expertise, trustworthiness, and duty to provide truthful and complete information. As a direct and proximate result of Defendant's violations of Section 10(b) and Rule 10b-5, Jesse suffered economic loss, including but not limited to investment losses, lost opportunity costs, and fees or commissions paid as a result of the fraudulent scheme.

53.    Failure to Supervise. Paragraphs 7 - 45 are incorporated herein by reference. Plaintiff is an individual investor who maintained an investment account through Defendant AAG Capital, Inc., a registered broker-dealer subject to the oversight of the Financial Industry

17

Regulatory Authority (FINRA) and the Securities and Exchange Commission (SEC). At all relevant times, AAG Capital, Inc. employed and/or controlled registered representatives (including Jesse's financial advisor, Dan Goodwin) and was responsible for supervising his conduct pursuant to FINRA Rule 3110, Section 15(b)(4)(E) of the Securities Exchange Act of 1934, and applicable industry standards.

54.     As a registered broker-dealer, AAG owed a non-delegable duty to establish, maintain, and enforce a reasonable system of supervision designed to ensure that its associated persons complied with applicable securities laws, regulations, and ethical obligations. This included the duty to supervise:

a.      Account activity for suitability and red flags of misconduct;

b.      Communications and recommendations made to clients;

c.      Trading patterns for signs of churning, unauthorized trading, or fraud; and

d.      Conflicts of interest, outside business activities, and personal trading by representatives.

AAG failed to discharge its supervisory obligations by:

a.      Failing to detect or respond to obvious red flags in Jesse's account activity;

b.      Permitting a representative under its supervision to engage in unsuitable investment recommendations, misrepresentations, and/or fraudulent conduct;

c.      Failing to monitor or investigate repeated warnings related to the advisor's conduct;

d.      Lacking adequate supervisory systems, policies, or personnel to detect and prevent misconduct; and

e.      Failing to take disciplinary or corrective action in a timely manner once misconduct became apparent.

As a direct and proximate result of AAG's failure to supervise its representative, Jesse sustained significant financial harm, including but not limited to loss of investment principal, emotional

distress, and opportunity costs. Had AAG Defendant properly supervised its representative, Jesse's damages could have been avoided.

55.    <u>Breach of contract/warranty</u>. Paragraphs 7 - 45 are incorporated herein by reference. Jesse is an individual investor who entered into a written and/or implied agreement with Defendants, comprised of a registered broker, a licensed financial advisor and registered representative, and those acting in concert with them, for the provision of investment advisory and brokerage services. This agreement included, but was not limited to, account opening documents, customer agreements, advisory contracts, and industry rules incorporated by reference. Under the terms of the agreement, Defendants agreed and warranted to act in accordance with Plaintiff's stated investment objectives, risk tolerance, and financial profile; make only suitable investment recommendations; comply with applicable laws, rules, and industry standards (including those set by FINRA and the SEC); and act in good faith and with reasonable care and diligence in handling Jesse's account.

56.    Defendants materially breached the terms of the agreement and warranty by:

a.    making unsuitable investment recommendations inconsistent with Jesse's objectives and risk tolerance;

b.    Failing to provide accurate and timely disclosures concerning investment risks, fees, and performance;

c.    Violating applicable FINRA rules or securities regulations incorporated by reference into the contract; and

d.    Failing to act in good faith and with reasonable care in managing Plaintiff's investments.

As a direct and proximate result of Defendant's breach of contract/warranty Jesse suffered financial harm, including but not limited to losses in investment value, excessive fees, and lost income or opportunity. Jesse would not have incurred these damages but for Defendant's breach.

19

At all relevant times, Plaintiff fulfilled all obligations under the agreement, including funding the account and communicating investment goals and preferences, and did not materially breach any terms of the contract.

57.     Conversion. Paragraphs 7 - 45 are incorporated herein by reference. Jesse is an individual investor who entrusted assets, including cash and securities, to the custody and control of Defendants for the limited and specific purpose of acquiring and managing investments in accordance with Plaintiff's instructions and stated financial objectives. At all relevant times, Plaintiff maintained full legal ownership and the right to possess and control these assets. Defendants, without Plaintiff's knowledge, authorization, or consent, wrongfully exercised dominion and control over Plaintiff's funds and/or securities by:

a.     Liquidating or purchasing securities in violation of Jesse's express instructions;

b.     Using Plaintiff's funds for unauthorized purposes or personal gain;

c.     Refusing to return funds or assets upon demand;

d.     Concealing the true status of Jesse's property.

Defendants' actions were intentional and constituted an unjustified interference with Jesse's right to control and possess his property. At no point did Plaintiff relinquish ownership or grant the authority for Defendants to act as they did.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered financial loss, including but not limited to the diminished value or total loss of the converted funds or securities, lost investment opportunities, and associated costs. Plaintiff has demanded the return of the converted property, but Defendants have failed and refused to comply.

59.     <u>Fraud</u>. Paragraphs 7 - 45 are incorporated herein by reference. Plaintiff is an individual investor who retained Defendants to provide financial advisory and investment services. At all relevant times, Defendants held themselves out as knowledgeable, trustworthy, and qualified professionals who would act in Plaintiff's best interest in managing and advising on financial matters. Defendants knowingly and intentionally made material false representations to Plaintiff, including but not limited to:

a.  Misrepresenting the nature, risk, and suitability of specific investments

b.  Misstating past performance or expected returns of certain financial products;

c.  Falsely assuring Plaintiff that investments were safe, guaranteed, or risk-free; and

d.  Omitting material information that would have influenced Plaintiff's investment decisions

At the time the above representations were made, Defendants knew they were false or acted with reckless disregard for their truth. These misstatements and omissions were made with the intent to induce Jesse to rely upon them, to invest in certain products, to retain Defendants' services, or to generate commissions and other financial benefits for Defendants. Jesse reasonably relied on Defendants' statements and omissions, believing them to be true based on Defendants' position of trust and expertise. But for this reliance, Jesse would not have made the investments or decisions recommended by Defendants.

60.     <u>Violations of Texas Deceptive Trade Practices Act</u>. Paragraphs 7 - 45 are incorporated herein by reference. Pursuant to § 17.45(c) of the Tex. Bus. & Comm. Code ("DTPA"), Jesse is a consumer. Defendants violated express warranties in connection with the provision of securities related services in violation of the DTPA. Additionally, Defendants' conduct was in violation of the following provisions of the DTPA:

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

(23) the failure to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

Additionally, defendants' conduct constituted an unconscionable act or course of action in violation of the DTPA. This wrongful conduct against Jesse, as a consumer, produced actual damages in excess of the minimum jurisdictional limits of this court, for which he seeks recovery. Additionally, because the conduct was committed knowingly, Jesse seeks additional damages as provided under the DTPA.

61. <u>Elder Financial Abuse</u>. Paragraphs 7 - 45 are incorporated herein by reference. Under Texas Human Resources Code § 48.002 and other applicable law, elder financial abuse includes the illegal or improper use of an elderly person's resources for monetary or personal benefit, profit, or gain. The conduct described herein constitutes financial exploitation on an elderly person because at all relevant time Plaintiff was more than eighty years old and because, among other things, (i) the defendants recommended unsuitable investments inconsistent with the client's age, liquidity needs, and risk tolerance, (ii) the investments were structured in a manner that effectively locked an 86-year-old individual out of his own capital, and (iii) the professionals involved profited through commissions and fees. Plaintiff relied upon Defendants due to their position of trust and superior knowledge.

22

62.     Undue Influence. Paragraphs 7 - 45 are incorporated herein by reference. Undue Influence includes a showing that someone exerted excessive influence, that the influence destroyed the person's free will, and resulted in a transaction that would not have occurred but for the influence. The conduct described herein constitutes undue influence on an elderly person by a financial planner because at all relevant time Plaintiff was more than eighty years old and because, among other things, (i) the defendants had a fiduciary/confidential relationship with Plaintiff and had the opportunity to exert, and did exert, pressure, (ii) Plaintiff was vulnerable due to his age and physical and mental incapacity, and (iii) the exerted pressure resulted in an estate or financial change that was unnatural and would not have occurred but for the pressure which favored Defendants. Plaintiff relied upon Defendants due to the established confidential relationship, their position of trust and superior knowledge.

63.     Negligence. Paragraphs 7 - 45 are incorporated herein by reference. Negligence includes a showing that someone failed to act with reasonable care in protecting the elder's assets, failing to act in their best interest, or allowing unauthorized transactions. The conduct described herein constitutes negligence an elderly person by a financial planner because at all relevant times Plaintiff was an elder person who was more than eighty years old and because, among other things, the Defendants had a fiduciary/confidential relationship with Plaintiff and Defendants failed to protect Plaintiff's assets by placing his funds in high risk investments. Plaintiff relied upon Defendants due to the established confidential relationship, their position of trust and superior knowledge.

64.     Respondeat Superior. AAG Capital, Inc. is independently liable for the errors and omissions of Defendant Goodwin because, as his employer, it is liable under the common law doctrine of respondeat superior.

## Damages

65.     Jesse is currently receiving a total of $1,047.09 per month from the three DSTs instead of the represented sum of $6,473.33. This 84% reduction in payments, coupled with the fact that the investments cannot be readily marketed or sold, establishes that the DSTs are worthless. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff suffered significant damages, including but not limited to the following:

a. Actual Damages. As a result of the securities violations described above, Jesse has suffered capital losses in the amount $1,500,000.00, plus lost investment opportunity on his investment.

b. Punitive Damages. Under Tex. Civ. Prac. & Rem. Code § 41.001 et seq, in addition to his actual damages, Jesse is entitled to recover punitive damages in the amount of two times his actual damages which is at least $3,000,000.00.

c. Additional Damages. Alternatively, under the Texas Deceptive Trade Practices Act, Jesse is entitled to recover three times his economic damages in the amount of at least $4,500,000.00.

d. Mental Anguish Damages. Under the Texas Deceptive Trade Practices Act, Jesse is entitled to recover mental anguish damages in the amount of at least $2,000,000.

e. Attorney's Fees. Jesse is entitled to recover his legal fees under Tex. Civ. Stat. Ann. art. 581-33(D)(7), Tex. Civ. Prac. & Rem. Code § 38.001 et seq., the Deceptive Trade Practices Act and any other applicable law.

**Conditions Precedent**

66.     All conditions precedent to the filing of this suit have been performed or have occurred.

**Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants, jointly and severally, as follows:

a.      Actual damages in the amount $1,500,000.00, plus lost investment opportunity on his investment;

b.      Punitive damages under Tex. Civ. Prac. & Rem. Code § 41.001 et seq, in the amount of two times his actual damages which is at least $3,000,000.00;

c.      Additional Damages in the amount of three times his economic damages in the amount of at least $4,500,000.00;

d.      Mental Anguish Damages in the amount of at least $2,000,000.00;

e.      Attorney's Fees;

f.      Rescission of the securities transactions where appropriate;

g.      Pre- and post-judgment interest;

h.      Such other and further relief as the Court may deem just and proper.


                              Respectfully Submitted,

                              SMITH & CERASUOLO, LLP

                    By:     /s/ Gary F. Cerasuolo
                              Gary F. Cerasuolo
                              State Bar No. 00789927
                              7500 San Felipe, Suite 777
                              Houston, Texas 77063
                              (713) 787-0003 Telephone
                              (713) 782-6785 Facsimile
                              gary.cerasuolo@gmail.com

                              ATTORNEYS FOR PLAINTIFF

25

<div align="center">

**<u>CERTIFICATE OF SERVICE</u>**

</div>

This is to certify that a true and correct copy of the above and foregoing document has been forwarded to all counsel via ecf, email, first class U.S. Mail, certified mail, return receipt requested and/or by other electronic means on March 12, 2026.

<div style="margin-left: 45%;">

/s/ Gary F. Cerasuolo

GARY F. CERASUOLO

</div>